Good morning your honor. May it please the court. This case involves a wrongful arrest and a case of excessive force as well as an ADA claim arising out of an incident involved in a trailer court in the summer of 2009. The police were called out to this trailer court. The vast majority of the calls during the summer were not involving criminal activity. They were more of a civil in nature, noise complaints where the officer did absolutely nothing. At some point prior to this incident the city sends basically a disorderly house notice to the appellant saying hey your house is disorderly. This was despite the fact that the appellant or plaintiff did nothing or was not involved in any of these problems prior to the incident in August. In addition the city council meets and says to the police officer if you're called again I want you to make arrests. And so this is the circumstances leading up to the incident in August of 2009. The police officers were called out due to a disturbance. The appellant was involved in this disturbance apparently. The police officer arrives, shouts to everybody in the trailer court come to my car. At which point he attempts to investigate what occurred prior to coming out. Nobody really gets around to ever telling him what occurred prior to coming out. The police officer then proceeds to ask the appellant plaintiff what occurred. The appellant plaintiff's interrupted argument ensues between the two parties and at some point they're shouting back and forth at which point the police officer within a minute of arriving says that's enough you two are under arrest. At that point there's witnesses and testimony that they heard clearly that the officer I think it goes to the wrongful arrest at that point because that's the point he made the arrest, that argument. And at that point in time he did not investigate what occurred prior. He has no knowledge of who did what, how an incident started. I thought they made a comment in there something about wanting to fight. That was in front of the officer at the point in time he arrived. I think the testimony is under the circumstances isn't that enough for an officer to place that person in a car? I think it was just loud. The plaintiff is answering a question. If you want to fight we can fight loudly. But I don't think there was any physical altercation or anything at that point in time. But the officer had to wait until a fist is thrown? No he probably doesn't have to wait before a fist is thrown but what occurred in front of him wasn't an actual confrontation or a fight. I think the comment is if you want to fight we can fight. At what point would that become disturbing the peace whether there's a fist thrown or not? My point is I don't think it amounts to disturbing the peace at any point in time. The officer was the loudest one on the tape. If you look at the tape the officer is the one shouting. You're suggesting that your client should have made a citizen's arrest of the officer for disturbing the peace? So I don't think anything amounted to disturbing the peace in front of the officer. I think the officer in the deposition and everything else was, well there's others in the trailer court that could have been disturbed but if you look at the tape he's shouting to everybody in the trailer court before he arrives. So I don't know how that comment got to disturbing the peace. And then at the point of arrest the appellant tells, there's numerous witnesses that testify that the officer was told about the decedent's phobia about placing his hands behind his back as a phobia. I think that the court relied on Royster to say hey these arguments are foreclosed by Royster but if you look at Royster the court held more along the lines of if you're informed of the injury but not the manner in which your customary arrest affects the injury. I think the appellees in their brief argued that's what Royster holds. I think this differs from Royster in that not only did the decedent tell the officer the condition he also said hey this is how the arrest would cause me problems. I have a phobia about being cuffed behind my back. The officer ignored that, placed him in the, cuffed him behind the back. Are you saying if the officer is arresting somebody and they say I have a phobia I don't want my hands behind my back that the officer has to accept that at face value and not handcuff him behind their back? I think there needs to be some evidence why the officer did not accept it. I mean there's no testimony by the officer that he did not believe the phobia. Well the testimony of the officer was he didn't hear it. That is true but he didn't say I didn't believe him. I mean there's numerous witnesses that said it was said and then he should have heard it. And so I think that the officer at that point even if he decides not to believe it would have some duty to look in and the situation and monitor the situation of the individual and if he goes into a panic attack or fearful situation as what happened here would be able to step in immediately to stop that. You say as happened here that he had a panic attack. I thought the record by everybody, nobody mentioned that there was any panic attack. He was handcuffed, walked back to the car, sat in the car, everything was calm, relatively calm. There was no indication that he was going into a panic attack. I think the indication is nobody after he's placed in the car, I don't think any of the witnesses said what occurred. The officer, as far as the video, you can see the officer in front of the vehicle talking to people not aware of the individual in the car at all. I mean getting him there, he got him handcuffed, he got him in the car without any trouble. The guy didn't start screaming and hollering, he can't stand it. That's true, he was calm immediately after being handcuffed. Isn't that some evidence that would indicate the officer that even if he heard that he had a phobia that he wasn't reacting abnormally? As far as when he was immediately placed in the car, after that point in time there's a six minute lap at least in the video. We don't know what was occurring in the car. At what point was it that the decedent requested that the officer remove items from his pocket? That was immediately on the rest. When he was getting handcuffed, he got handcuffed and said, hey, can you remove these items? So at that point he was conscious enough, reasonable enough to be concerned about matters other than being handcuffed? Yes, your honor, I think that's what is shown on the video. At some point witnesses also indicate they say there's a phobia at that point as well. Numerous witnesses, but it doesn't show up on the tape. But if you look at the tape, your honor, a lot of the verbal stuff of what other parties say, it's clear the officer is hearing more conversations after. He's talking to people, you don't hear what they're saying, but you hear what the officer says. Other than the statement, I have a phobia, what other statements were made that indicated the officer ought to be concerned for the individual's welfare? I think the statement of the witnesses was the phobia about having his hands cuffed behind his back. And so I think once he's told that, he should be concerned. Did anyone say anything about what that might, what might be the consequence of that condition? I don't know if, nobody was allowed to say anything further at the point, at some of that point the officer says, hey, either do it or I'm going to tase you. But I think the trial court relied on, well, that they didn't indicate it would cause extreme death. But I think it's a case where the phobia is, the definition of a phobia itself is going to cause extreme fear. And I don't think it's unreasonable or that a fact finder could not find that a phobia causing extreme fear could lead to a panic attack as well. And so I think the officer should have had some duty to monitor the situation after he's placed in the car, leaving him in a state of extreme fear. At some point, he did it. Did the officer never check on the individuals in the back seat of the car who had just a few moments earlier had been threatened to fight each other, and now they're in the back seat of a car together? I think one was in the front and one was in the back. And there was a divider, the officer indicated. But I think by the tape, the officer, I think, made self-serving statements. They were always in my vision. But if you actually look at the tape, he's walking out to actually then start his investigation with people that witnessed things and was talking the same thing, what occurred, what happened here, to justify this arrest as far as what occurred before, if there was any charges for that. So I think at that point, the officer did not check on – I mean, you can see him turned around talking to witnesses. They were not in his line of sight. I don't think there's any evidence at what point Mr. Driscoll went into a panic attack and later died under this situation. Does the record show what the duration of the time in the car was? I think it was about eight minutes. I think they said six to eight minutes. Six to eight minutes, but some of it was putting the next gentleman in and then leaving the scene somewhere around there. I'll reserve those ones. Mr. Horvoy, before you sit down, I have a couple. Where did you file this case? In the district court. I know, but – In North – In North Platte. Scott's Club, I believe. Yeah. But did you argue the summer judgment to the judge? It was done by groups, Your Honor. Okay. Well, I was curious, since Baird is – I grew up out in that part of the country. I know where Baird is. Yeah. Why this wasn't filed in North Platte, which is a place for the District of Nebraska to have court, and or why it might not have been disposed of there. We're always happy to have the business here. I'm trying to figure out why North Platte wasn't in the act. I think it was – I'm not sure. I think the trial was scheduled. Did you ask – It was going to go to trial, go to North Platte. You requested – Yes. You requested North Platte. Okay, thanks. That's all right. Sorry. Good morning, Mr. Olson. Good morning. Mr. Justice Smith, I want to just elaborate on one issue, and that is that after the officer put Mr. Driscoll into the back seat of the car, he went in and got Mr. Gillette. And then I think the testimony is that process took maybe a minute or maybe up to two minutes. He then took Mr. Gillette around and put him in the front seat of the car and testified that he checked Mr. Driscoll again at that time and saw no problems, that he was looking around, he was able to see his eyes, wasn't talking, but he was able to observe him. So certainly we have again an officer who, while he's arresting the other party, is also cognizant of what's going on with Mr. Driscoll in that car, and I think that's important. When you talk about that excessive force claim, we have got something that is so speculative, a phobia. That's all it said by Mrs. Driscoll and the other witnesses is a phobia. When you get a little deeper into her testimony, we see that it's even more speculative. Her comment is that he just thought people were out to get him. He had many weird phobias, she testified to. And he had all these since he was a little baby. And yet only one time in 1998 did she see anything that she described as something like a phobia. And she described it as he flipped out when he was in a police car. He'd been arrested at a laundromat. By the time she got there, he was already in the police car. And by flipped out, all she said was he was just yelling at the other party involved in that altercation. That's the sum total of all we have for testimony about a phobia. We don't have any testimony about panic attacks. We have testimony that Zach Douglas, the officer, never had contact with Mr. Driscoll such that he had to arrest him or saw these phobias or panic attacks. Had they had meetings before? They had had meetings before, but not in terms of arrests. They knew each other. There was one time... Because I think there is that statement where the decedent says, you know me? That's right. What was the context of that statement and what was being communicated by it? There was one instance many years ago where Zach Douglas and another officer encountered Mr. Driscoll in a bar. And there was some issue about whether they should arrest him. Ultimately, they did not. All the other occurrences would have been things like people complaining at the trailer home about barking dogs or loud music. And the chief said, oftentimes, I knew Dan Driscoll. I would stop. I would talk to him. So certainly they knew each other, but not so much in terms of law enforcement. So you're saying there's nothing in that statement or its context that a juror could infer knowledge of some idiosyncrasy of the decedent? Not at all. Not about an idiosyncrasy. Zach Douglas testified to that. Another officer, Ron Dean, testified. He never alerted Zach Douglas. There just is not a history of contacts between Driscoll and Douglas to give him any idea that if I arrested him, he needed to be cuffed in the front or I had an issue with panic attacks or anything like that at all. In fact, you can see from the testimony that the chief was somebody who was called out to this trailer park many times. And usually what he did is he talked to people. And he talked to them over what was going on. The events of this particular day were far different than anything he had encountered at that trailer park before. That's why this incident is different, and that's why probable cause existed. Does the department have any policies about preferences for handcuffing? The policies were that somebody should be cuffed behind the back because that was an officer safety issue. But even Officer Douglas testified that on two previous occasions he allowed people to be cuffed in the front. One was somebody who had a birth defect in their arms or shoulders and it was difficult to get their arms behind their back. And a second one was somebody who had gone through, I think, a shoulder surgery or a back surgery, I think it was. And again, he allowed in that situation to cuff them in the front. But those were situations where he knew of those limitations. Here he's told, I have a phobia, and that's it. And you go beyond that, and once you get beyond Driscoll's resistance to the arrest, everything is completely calm. He said, will you take the screwdriver out of my pocket? Will you take my hat off? Then Douglas escorts him over the police car, no problems. Puts him into the police car, no problems. Check with him another minute or two minutes later, no problems. There's nothing here that should have triggered with Officer Douglas that he should have done something different. And he testified, if I had known, I would have treated Gillespie, or the deceased rather, just like these other people, and cuffed him in the front. That just did not happen. What was the cause of death? Heart attack, was it? He died of a heart attack. Was there any evidence that the arresting officer knew that he had a heart problem or anything of that nature involved here? Not at all. And in fact, from the family. He really did not have any issues in terms of heart conditions. Hadn't been treated really with doctors for anything, much less for any kind of phobia. Certainly wasn't diagnosed with any type of phobia. And it's interesting, Your Honor, that there were times that he was treated, once for an MRI, and on the intake sheet he said he didn't have any claustrophobic problems. Another time for surgery, when he had to fill out some type of an intake, where he said he didn't have any type of claustrophobic issues. And yet it's Mrs. Driscoll who's saying that part of this phobia is being in a small, tight spot, like the police car that contributed to this. So even she was unaware of any types of problems that her husband had. And so certainly Officer Douglas was. And when you go to the issue of probable cause, I think we have to go back a lot further than just the scene of this accident. The city of Baird is not quite like Mainbury, although it's a little bit similar. It's a very small town. And here you've got Officer Douglas in his office, and he hears four different calls to the dispatcher in rapid succession. And before that fourth call, he's already heading to his car and in his car because he knows that's unusual, something is different. That doesn't happen. And he knows there's either a serious altercation or a serious motor vehicle accident. So he's in his car heading to the trailer park, and he's told, we have a confrontation between Driscoll and a guy by the name of Jim Gillette. And Zach knows there's a history between those two. They don't like each other. He also knows there's a history going on out there causing problems between Jim Gillette and his wife over some property. So he knows all these things as he's heading to the trailer park. He gets there, and he's waved into the park by a woman. He testified to that. That's something, again, that caused him to believe that here we have an altercation that is continuing. So he gets in there, and the first thing he sees is parties scattering. Obviously reasonable that parties are going to scatter when a police officer comes. And part of what he sees is Dan Driscoll up near Gillette's property, which would be unusual because they don't get along together. And he sees this vehicle, this pickup, that's subject to the divorce between Gillette and his wife, and he sees Driscoll walking away from the pickup and walking away from Gillette's property holding a battery. And he sees Gillette walking the other way with two people on his arm helping to escort him. So at that point in time, the reasonable reaction is, I've got to keep everybody from leaving. And he calls them all to his car. And that's where we see the videotape. Chaos. What's happened? And what you have is people pointing fingers at each other. The testimony is Dan Driscoll had to be restrained from going after Gillette at that point. And he yelled, if you want to fight, let's fight. So at that point in time, I suppose... Who was that directed to, the officer or to Gillette? To Gillette. At that point in time, I suppose there are three options. Zach Douglas can do what he did before, talk it down, and leave. He thinks that's not a good option because there are going to be more problems if I do that. Number two, he could have cited both parties. And again, he thought that's not a good deal because this may continue into the future. He thought he had no other option. The fact that disturbing the peace was going on right in front of him and was likely to continue. The plaintiffs say that there was, in essence, a promise earlier that if there was any more trouble out here, somebody's going to get arrested, so that the decision to arrest was made before there was actual observation of the incident. A couple of different issues with that. First of all, that testimony came from a Brian Lockman who went to a city council meeting on the 11th, so about seven days before this incident, and testifies in his affidavit that the city council said that to him. Zach Douglas does not say that. He was at the same council meeting. Zach Douglas testified, I didn't have any policy of going out and arresting the next person I found out at the Hessler trailer park on my next visit there, and I didn't do that. In any event, let's assume that's the case. Let's assume that the city council told the chief, hey, next time you or any of your people go out there, you better come back with somebody. The law would still say that the subjective intent, the motivation of the chief, is not relevant as long as we have probable cause. And from the testimony, we have a long litany of probable cause in terms of the fact that disturbing in peace had been going on, was going on, and likely would continue if the officer left alone. Well, our probable cause also is judged in the light of an objective police officer, not the subjective propensities of a particular police officer. Is that correct? Absolutely. So regardless of what frame of mind he goes out there with or worried about what his city council members are going to do with him if he doesn't come back and make an arrest, those are really not relevant. It's what's objective. And here we have so much in the way of probable cause. And even if someone were to find that there's no probable cause, certainly there's arguable probable cause. We've got the testimony from the chief in terms of what his concerns were, that this day was different. He'd never been out there where Dan Driscoll had been saying, if you want to fight, let's fight. And that portion of the videotape is instructive to us to show that there were some real hostilities, not just between the two of them, Gillette and Driscoll, but between the people that were on both sides and supporting both sides of those people. It was a continuous situation, and as a result of that it was appropriate for Officer Douglas to make the arrest that he did, regardless of what the city council did. You also, Your Honor, have to look at, go back a little further than that. July of 2009, these disorderly house notices were issued by Chief Douglas. They were warnings, but yet he never really followed up on those warnings. Testimony is he made other visits to the Hessler trailer park that summertime, did not make arrests, oftentimes did not make citations, would talk the people out of what was going on. So it's not like you've got a rogue chief of police or a city council that's trying to do something. If that were the case, they had opportunities well back to early July when they sent out those disorderly house notices. That just did not happen. Why do you think this is consistent with Royster v. Nichols? It's consistent because in Royster v. Nichols it says, you've got to have something that is visible and obvious. There, the complaining party said, I told them I had a military incident, a problem with my shoulder and back. That's more specific, certainly, than saying I have a phobia. But yet the two cases are similar, Royster in this case, because nothing was said beyond that about, here's what will happen if you cuff me behind my back. This may be a far different case if Officer Douglas first heard about a phobia, but secondly if he was told, hey look, if you cuff him behind his back, he's likely going to have a panic attack. And when he has a panic attack, here's what can happen. None of that took place. And what he observed with regard to Mr. Driscoll just did not fit with somebody who had a phobia and somebody who had a panic attack. It's going to be a problem with our police officers. If I say I've got a fear of heights, if I say to an officer I've got a phobia, something more is required on my part to instruct that officer, here's the effect of this phobia. If that's the case, anybody can say I've got a phobia. Was the testimony just a phobia, or was it a phobia about being handcuffed behind his back? It's difficult. The evidence we believe says it's just a phobia. There's some indication that maybe somebody may have said he needs to be handcuffed in front. I don't think that's very apparent from the record. I think if you look at the videotape, you see the fact that even Mrs. Driscoll was yelling, he's got a phobia, he's got a phobia. But that was it. And again, when he cuffs him behind his back, the first thing Driscoll says is, will you take the screwdriver out of my pocket? Will you take my hat off? Nothing else to give Douglas an idea that, okay, I've cuffed him behind his back, now we've got some problems with how he's acting. Okay, your time's expired. Thank you, Mr. Olson. Ms. Rudolph, how much time does Mr. Harbaugh have? He has 2 1⁄2 minutes, Your Honor. Okay. Thank you. First, this was decided as a motion for summary judgment, so I think the factual issues have to be decided for the appellant. And I think in that line, Your Honor, you have to assume the city council did instruct Officer Douglas, if he went out there, to make an arrest. I think that's a factual issue. Also that, you know, some of Douglas' statements are self-serving, but he does indicate in his own deposition that, hey, if I'm told about a phobia, I should have cuffed him in front. Well, Mr. Harbaugh, the issue with the city council is a cause of action against the city council, failure to train, that sort of thing, doesn't run, does it, to the police officer? Well, and that's fine. I mean, we have that cause of action against the city as well. Okay, but you're lumping the police officer in with this statement that purportedly happened at the city council that we must take into account. Yes, Your Honor, and I think that goes to the failure to train that the city instructed him or told him to do. So you're talking to that cause of action? To that cause of action as well, but I think it also instructs on the wrongful arrest as well. If the officer went out with the intent, I think there's a presumption, and just because he made self-serving comments, no, no, no, I think there's a factual issue. Did the officer, and that would require a trial, did he go out with the intent to make the arrest, regardless of the situation? And I think there's also a disagreement or a factual issue. Well, we look at the issue of probable cause for the arrest on the issue of wrongful arrest that you've raised. Is that right? Yes. Yes, Your Honor, I think that you look at the wrongful arrest, and as far as the factual issues go, I think Jessica Driscoll indicated that her husband did not have a problem with Gillette, that they'd never had it passed history, even though the officer says they did. I think that is disputed as well as far as the factual issue in trial is they just didn't have problems in the past. Yes, Mr. Gillette and his soon-to-be ex were going through a divorce and caused some problems in the trailer court, and calls around, but I don't think there's any history that Officer Douglas could have been aware of that they ever had problems or a fight in the past or any confrontation in the past to come out and just assume, hey, there's trouble because of these two. I don't think the evidence would support. Thank you, Your Honor. Thank you. Well, we appreciate your arguments and we will take it under advisement and be back in due course and have a safe trip home. Thank you.